Filed 12/11/25  P. v. Reed CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DAVANCE L. REED,<br><br>    Defendant and Appellant. | A166080<br><br>(Marin County<br>Super. Ct. No. SC206790A) |

Davance Reed was charged with second-degree murder, two counts of attempted murder, and other crimes and enhancements after he shot three people at a detoxification facility, stole a car, and fled the scene.  The victims were B.M., the mother of Reed's child who had urged him to enter the facility, and two employees who were conducting his intake, A.M. and Nathan Hill.  Reed pled not guilty by reason of insanity.  A jury convicted him of all charges in the guilt phase of his trial and found he was sane when he committed the offenses during the sanity phase.

Reed claims the trial court erred by admitting evidence of his prior felony convictions to impeach his out-of-court statements related to his mental state, and by excluding testimony by his expert witness on the same subject.  We affirm.

1

# I.  BACKGROUND

Reed and B.M. were an on-and-off couple for ten years and had a son. They met when both were selling drugs in San Francisco's Tenderloin neighborhood, where Reed was also "pimping women."  When their son was two years old, B.M. entered a residential drug treatment program after she was arrested for using methamphetamine.  She successfully completed the program and was sober for about five years, eventually working as a drug and alcohol counselor herself.  Meanwhile, Reed was incarcerated for about three years.  He was released in the spring of 2018.

Following his release from prison, Reed stayed with B.M. some of the time and sometimes stayed at his great aunt's home in Vallejo, where his mother also lived.  He was selling drugs again and said he wanted to resume working as a pimp but "didn't have a girl yet."  He was apparently attending a class at College of Marin, and wrote in a college notebook about a business plan for an escort service.  B.M. had relapsed and was using certain drugs with Reed, but she did not want to use methamphetamine or have it "around [her]."  She saw a gun in Reed's hands or in the trunk of his car during this period and told him to get rid of it, but he refused.

B.M. communicated with a woman who said she had sex with Reed (which he later admitted) and might be pregnant.  Meanwhile, Reed told B.M. he believed she was having an affair with her ex-boyfriend "Hammer" and was trying "to put [Reed] in prison for life so [she and Hammer] could be together."  B.M. testified that at this time, she had not been in contact with Hammer for years.

## A.    *Reed's Conduct Before the Shooting*

B.M. testified that in the weeks leading up to the shooting, she thought Reed was acting strangely, and not only because of his drug use.  Reed said

2

that people were trying to kill him, "a lot." He would pace around B.M.'s apartment, look out the peephole, and ask who was out there when nobody was. Once, he paced around the apartment with his gun and told B.M. he felt threatened by neighbors B.M. saw no reason for him to be scared of.

Reed was "very paranoid" and "thought messages were being delivered to him about [B.M.] cheating," including through a song that played on the radio that had "the word 'hammer' in it." He made facial expressions that "were just like lost or like he was just not there with . . . what was happening." Reed told his son that people were watching him through the television set, and said he wanted to "feel the earth in his body" and to take his son with him to do that. Reed also said "the mafia was out to get him," and drugs had been placed in a tire in his sister's car and he had to "slice open the tire" and get the drugs out. When B.M. found a nail in the tire of her own car, Reed "thought it was them coming after [her]."

Reed's great aunt had raised Reed and taken his mother to receive mental health treatment. She also described Reed as "paranoid" before the shooting. She testified that Reed believed someone had put cameras in his car, and told her "a man walked out of the water and gave [Reed] an insight to his life and [Reed] gave the man like $100." Reed told his great aunt that B.M. looked like "a 108-year-old witch." He told his mother that a two-headed dragon was coming out of a streetlight near his great aunt's home. Reed's mother told investigators she thought Reed was high when he said this.

B.M.'s sister and her boyfriend went to the movies with B.M. and Reed, and B.M.'s sister observed that Reed was "different" than during their previous interactions, "was very spacey," and "wouldn't talk in full sentences." Reed told the sister's boyfriend he wanted to talk, so they went to

3

the bathroom, but Reed "was talking to himself" and did not explain his request: "It was a lot of mumbling to himself, and it looked like he was answering his own questions in his own mind." The day before the shooting, the boyfriend saw Reed "in a daze, . . . just looking up the stairs" at B.M.'s sister's house, and he asked Reed if he needed some help, meaning "psychiatric help."

B.M. took Reed to a mental health provider and to Marin General Hospital, but staff at both facilities told her there was nothing they could do because Reed did not have a plan to hurt himself or someone else. B.M. and Reed again broke up and "made up," with the condition that Reed be "drug-free from hard drugs."

## B.    *The Shooting at Helen Vine*

One Friday afternoon in November 2018 until the following Sunday morning, Reed, B.M., and a friend were at B.M.'s apartment hanging out and using drugs. The friend testified that they all used cocaine. On Saturday night, Reed pulled more drugs from his pocket. B.M. and the friend used some and came to believe "meth . . . was mixed into the cocaine" because "[t]here were sparkles and hard pieces" when it was held up to the light. The friend was upset because she would not have willingly used methamphetamine. At this point, B.M. "started talking about [Reed] needing to go to detox because . . . she realized that . . . meth use had been going on for awhile [*sic*]." Reed responded with "a lot of back and forth agreement" followed by "shaking [his] head" and expressing "disagreement."

B.M. testified that Reed said he did not want to go to a detoxification facility, but agreed to go after B.M. told him he would otherwise need to "leave." B.M. contacted an acquaintance who worked at a facility in Marin County where B.M. had once been a client, the Helen Vine Recovery Center.

4

She told the acquaintance that Reed had "lost his fucking mind," was "meth'd the F out," and needed "detox and program."

B.M. called another employee at Helen Vine around 9:00 p.m. that Sunday. The employee spoke to Reed and found him "[a] little resist[a]nt, a little terse," which was "typical." B.M. told the employee that Reed was "coming down off coke" or "some substance." Reed said, " 'Yes,' " he was under the influence of alcohol or drugs. The employee told Reed and B.M. that a bed was available at Helen Vine.

Reed and B.M. arrived at Helen Vine after midnight that Monday morning. They made a stop on the way, and Reed used a drug he had with him after B.M. told him he could not bring drugs to Helen Vine. B.M. believed that the drug Reed used was methamphetamine. Reed asked B.M. if she wanted some, and she "grabbed it from him" and "threw it out the window trying to just get rid of it."

When Reed and B.M. first arrived at Helen Vine, Reed "kept saying, this is not a detox, look where we are, we are in the middle of nowhere, this is not a detox." Reed said he wanted to leave, and he and B.M. got back in the car and began to drive away. B.M. was angry and said that if Reed did not go to Helen Vine, she would drop him off at his family's house in Vallejo. Reed relented and agreed to go to Helen Vine.

Reed and B.M. returned to Helen Vine, entered the facility, and began the intake process in a front office. They were assisted by A.M. and Hill. B.M. kissed and hugged Reed and sat on his lap, trying to "console him" and "make him feel better about going into detox." The intake form that was later recovered indicated that Reed's primary drug of abuse was methamphetamine, and he used it 30 out of the last 30 days.

A.M. walked to a back room with Reed so Reed could provide a urine sample, which was expected to test positive for drugs to justify his admission to Helen Vine. According to B.M., Reed "said he couldn't go" and "was acting really strange." A video played for the jury showed Reed walking in and out of the bathroom in the back room several times. At one point, Hill walked Reed back to the bathroom again, and Reed went in and shut the door. The last thing B.M. remembered was that Reed "was not able to complete the urine test" and she was "trying to convince him to."

Security camera footage played for the jury showed the front hallway at Helen Vine with Hill, Reed, and B.M. in the front office, visible from the hall through interior windows. Hill sat down behind a desk near the office's door to the front hall, while Reed and B.M. stood in the back of the room near a copy machine. A.M. was also in the front office, in the area of his desk in the back, but was not visible to the camera. Reed was facing the back of the room with his back towards the hall door. He backed towards the door with B.M. near him, then reached behind her with a gun in his right hand pointed towards A.M.'s desk and fired. Reed continued moving towards the hall door with B.M. following him. Hill stood up and raised his hands in front of him, then fell as Reed pointed his gun at Hill and fired. Reed entered the hallway and moved towards the exit to the parking lot with B.M. running after him. He turned towards B.M. with the gun in his hand and fired, as she raised her hands to her head and fell to the ground. Reed ran outside, then ran back into the hall and into the front office. He bent over in front of the desk where Hill was and shot Hill again, in the head at close range. Reed moved briefly around the office and ran out again with his gun in one hand and a set of keys in the other.

Another video played for the jury showed Reed outside Helen Vine in the parking lot. He went to the driver's side doors of three vehicles. He opened the door to the third vehicle—which was owned by A.M.'s mother—got in, and drove away.

Officers responded to multiple 911 calls about the shooting. They arrived at Helen Vine and found B.M. in the entry hallway with a traumatic facial injury. Inside the front office, Hill was face down in a puddle of blood. He was not breathing and had no pulse. A.M. was in a chair at the back of the office. Two people were holding towels to his face, which was bleeding profusely.

Hill died from multiple gunshot wounds. A.M. sustained a gunshot wound to his upper forehead and very severe brain and head injuries. He lost an eye, was in a coma for a month or longer, and was living in a care facility at the time of trial. B.M. had a gunshot wound to her left forehead and her left eye was destroyed. She also suffered a brain injury and was in a coma for a couple of weeks. She lost her sense of smell, suffered from anxiety, depression, and post-traumatic stress disorder, and was home on disability at the time of trial.

## C. Reed's Conduct After the Shooting

Soon after the shooting, Reed was driving A.M.'s mother's car at high speed on Highway 101 in Sonoma County. When an officer tried to stop him, he exited the highway and slowed down to five miles per hour, then accelerated back onto the highway. Reed again exited and re-entered the highway, reaching speeds between 100 and 120 miles per hour. Officers deployed a spike strip and were able to stop the car. Reed exited the car as instructed and was transported to the Sonoma County Jail. Offers recovered

15 intact Xanax "bars" or pills and "about seven broken pieces" from Reed's jacket pocket.

As he was being arrested, Reed had difficulty answering simple questions and mumbled to himself. He told the arresting officer that he had a twin brother, provided two dates of birth and four variations of his name, and told the officer that he "was running because he thought he was being chased" but did not believe the officer "w[as] a cop." He told officers he had taken Xanax, methamphetamine, and cocaine. He said he had just purchased the car he was driving from a friend but did not have the friend's phone number. At one point during his booking—just after an officer told him he would be charged with "felony evading, possession of Xanax, [and] driving on [a] suspended" license—Reed smiled and danced in his chair. He explained that he " 'was thinking about a birthday party [he] once had.' "

Detectives interviewed Reed at the Sonoma County Sheriff's Office over the course of about five hours, beginning 10 to 11 hours after the shooting. Reed told them his name but misspelled both his first and last names. He initially denied having any relationship with B.M., denied having any children, and told the officers he had been arrested for jaywalking after spending the day at the beach. But Reed appeared relieved to learn B.M. was alive, and as the interview continued, he acknowledged his relationship with her and his son. Eventually, Reed agreed that he and B.M. intended to go to Helen Vine, but claimed he " 'didn't make it.' "

Reed told the officers "he had snorted a five-sack of crystal . . . on Saturday." An officer asked if Reed was " 'still under the influence of crystal meth when you went there?' " and Reed said he " 'was coming down.' " Unprompted, Reed said, " 'I want people to help me with my problems versus

like trying to maneuver me.' " But he said " 'no' " when asked if the people at Helen Vine said something that angered him.

After initially responding " 'what gun' " when officers asked about the firearm used in the shooting, Reed eventually told them he threw it from the car when he " 'was going 120 miles an hour,' " after " 'the cops were behind [him].' " Officers later recovered a gun from the area of the pursuit, with ammunition matching that found at Helen Vine.

When an officer asked Reed what was going through his mind during the interview, he said, " 'I don't want to say nothing bad that's going to have me, you know, get fucked over.' " An officer asked Reed to close his eyes and think about what happened at Helen Vine. Reed said, " 'I see that table I was at, chair that I was at, black dude on the right, [B.M.] on my left.' " When asked if he was scared of losing B.M., Reed said, " 'No, I had already lost her.' " When asked if B.M. "got in the way," Reed said, " 'I don't know. She was in front of me. It was not good.' " Reed never directly admitted to shooting anyone at Helen Vine.

At one point, officers left Reed in the interview room alone and he masturbated. He then went up to the camera recording the interview and looked into it.

A paramedic took a blood sample from Reed about 18 hours after the shooting. No alcohol and no " 'common' " controlled substances were detected in the sample. Officers found Reed's College of Marin notebook in B.M.'s vehicle.

Reed was transferred to the Marin County Jail about two days after the shooting. Phone calls that he made in the weeks and months that followed were played for the jury. In several calls, Reed spoke with the sexual partner B.M. had contacted and two other women he expressed sexual or romantic

interest to. He told the women that he expected to be released soon. Reed told one of the women that he was "super single," told her to call his brother for information, and said, "I got enough evidence to prove my inno--, well, to prove my defense of what happened." He explained that he "need[ed] to go get [his] mental health checked out, quote unquote." He said his lawyer was trying to obtain documents concerning his "P-T-S-D," "anxiety," and "depression," but was "taking his sweet-ass time." He told the woman he was "trying to get . . . to the mental health hospital and if [he] g[ot] there," he would "have to do six months," but "that's basically like being on the street."

In another call, Reed complained to a male associate that people were telling him B.M. was "in the hospital fighting for her life," but he had learned she was at a party with his son and another man. Reed said he was going to "get [him]self into the . . . mental hospital" "for a couple of months," and when he "present[ed] [his] evidence" the jury would "say not guilty . . . due to . . . mental health." Reed similarly told his son he might spend "one or maybe two" years in custody, but "your mommy, she got all the pull . . ., so if she want me to come home sooner she could. So you gotta talk to your mommy about that." Reed also spoke with B.M. directly over the phone twice, in violation of a restraining order.

## D.  *Reed Is Tried and Convicted*

Reed was charged with the murder of Hill (Pen. Code, § 187, subd. (a)), attempted murder of B.M. and A.M. (*id.*, §§ 664/187, subd. (a)), mayhem on B.M. and A.M. (*id.*, § 203), domestic violence on B.M. (*id.*, § 273.5, subd. (a)), theft of a vehicle from A.M. and his mother (Veh. Code § 10851, subd. (a)), recklessly evading a peace officer (Veh. Code § 2800.2), possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1)), and several enhancements. After he pled not guilty by reason of insanity, the trial court

10

appointed Drs. Michael Rogers and Omri Berger to examine him pursuant to Penal Code section 1026 et seq., which set out the procedures for trying such a plea.

During the guilt phase of Reed's trial, B.M. and other witnesses testified about the shooting and surrounding events as summarized above. B.M. said she knew of no reason why Reed would want to shoot her or the Helen Vine employees, and Reed had never been physically violent towards her before.

Reed did not dispute that he shot B.M., A.M., and Hill at Helen Vine, stole A.M.'s car, and fled from police. His counsel told the jury that only Reed's state of mind was in dispute and argued that Reed suffered from "mental health issues, whether schizophrenia or substance abuse disorder." Reed did not testify at trial, but offered other evidence to support this defense—including the videos of his arrest and post-arrest interview.

1.    *Treatment Providers*

A therapist who met with Reed about three months before the shooting testified for the defense during the guilt phase. She had interviewed Reed at the Marin County Crisis Unit in the Marin General Hospital, where B.M. accompanied him. Reed told the therapist "[h]e was worried about people talking about him" and "felt uncomfortable in certain situations" which she characterized as paranoia in her notes. The therapist did not meet with Reed for long enough to diagnose him, but determined he did not meet the criteria to enter the unit, which were "active suicidality, active homicidality," or psychosis rendering a person "unable to manage himself."

A social worker who interviewed Reed when he arrived at the Marin County Jail testified for the prosecution. She explained that the purpose of her interview was to understand if Reed "had any special mental health

11

needs" or "was a risk to harm himself or others." The social worker recalled that Reed had good eye contact during their interview and "his speech was clear and . . . within normal limits." He was calm, relaxed, and "did not appear distressed." Reed's "thoughts appeared organized and goal-oriented," and he did not "spontaneously offer[]" any "bizarre or unusual thought content." The social worker did not observe any symptoms that would indicate hallucinations or paranoia. Her opinion was that Reed had "[s]timulant use disorder, an analytic disorder and cannabis disorder." She consulted with a jail psychiatrist and determined that no psychiatric referral was needed.

The treating psychiatrist at the jail testified for the defense. She first met with Reed about 10 days after the shooting—at his request. In her initial report, she noted that Reed's insight and judgment were adequate, he had no serious mental status abnormalities, and there was no evidence of psychosis. She diagnosed Reed with substance use disorders and not schizophrenia. Beginning in January 2019, Reed reported more significant symptoms, and the psychiatrist prescribed antipsychotic drugs. Throughout 2019, she noted in her reports that Reed had a long history of substance abuse and could be exaggerating his symptoms due to the severity of the criminal charges he faced. But beginning in January 2020, she no longer thought Reed was exaggerating. Three to four months before trial, after she had treated Reed for over three years, the psychiatrist concluded that he had schizophrenia. She acknowledged that this was longer than it normally took her to diagnose a patient: in fact, "[t]his [wa]s a first."

2.  *Expert Witness for the Defense*

Dr. Jess Ghannam testified for the defense during the guilt phase. Dr. Ghannam was a clinical psychologist and professor at the University of

12

California, San Francisco.  He met with Reed face-to-face on three occasions in 2018 and 2019 in the Marin County Jail.  Based on these meetings and his review of other records, Dr. Ghannam opined that Reed suffered from schizophrenia and a "history of polysubstance abuse and dependence."

Dr. Ghannam described the symptoms of schizophrenia, including "delusions and hallucinations" and disorganized or incoherent speech.  He explained that a hallmark of the disorder is a shift between periods when it is " 'Stabilized,' or somewhat in remission," and times "where it's more florid, or what we call an, 'Exacerbation,' of the symptoms, which means it comes out and it's worse."  These changes can have various causes, including "whether or not the person is getting treatment, . . . whether or not they are in a stable situation, [and] whether or not they are using or abusing drugs."  Dr. Ghannam explained that "there is no cure for schizophrenia," and antipsychotic medications "are only moderately effective."

Dr. Ghannam testified that during his interviews with Reed, Reed "exhibited behaviors that, in [Dr. Ghannam's] opinion, reflected not only delusions, but possible hallucinations."  For example, "in the middle of a conversation . . ., he would stop, look to his right or look to his left, as if he was responding to something that was not happening."  Dr. Ghannam was "surprised by the level of psychotic symptoms" he observed considering the "amount of antipsychotic medication" he understood Reed was taking.  He administered a test to determine whether Reed was "malingering" or "faking [his] symptoms," and Reed scored "in the normal rage, which indicated low likelihood that the answers were fakes, exaggerated, or made up."

Dr. Ghannam explained that Reed's receipt of antipsychotic medication during his incarceration before the shooting further supported his diagnosis, as did Reed's unusual statements about his car, the man coming out of the

13

water, and the dragon coming out of a street lamp. So did Dr. Ghannam's review of Reed's college notebook, which seemed to show that "Reed was having a discussion with somebody else, or himself, or some other disembodied thing" and was "really struggling." Reed's statement in the notebook that Russians had bought him as a sex slave was "a delusion consistent with schizophrenia."

Dr. Ghannam further opined that Reed's behaviors in the video of the Helen Vine shooting "appeared disorganized." The video showed Reed "rocking back and forth," which was "very consistent with a diagnosis of psychotic spectrum disorder or schizophrenia." Reed made "head movements back and forth, as if he's hearing voices or worried someone . . . or something [was] behind him," which is "a symptom of paranoia." Dr. Ghannam also noticed "some smiles or some grimaces and kind of looks on his face that were incongruent with what was happening in the moment," which "can, also, typically, be a sign of some sort of psychosis or psychotic spectrum disorder."

Dr. Ghannam also testified about Reed's behavior when interviewed by officers after his arrest. He opined that a number of these behaviors "supported the diagnosis of schizophrenia: The darting of the eyes back and forth, the agitation, the giggling, the kind of being preoccupied," and the "self-serving sex act with himself."

Dr. Ghannam summarized that his opinion, "with reasonable medical probability," was that "Reed was suffering from schizophrenia and severe psychiatric distress and psychotic spectrum disorders at the time of the incident."

3.      *Expert Witnesses for the Prosecution*

Dr. Rogers, one of the forensic psychiatrists appointed by the court, testified for the People in rebuttal. He opined that Reed had "a variety of

substance use disorders" and "was under the influence of a drug" at the time of the shooting.

Dr. Rogers met with Reed twice in the Marin County Jail. He assessed that Reed "did not demonstrate any objective signs consistent with experiencing hallucinations," and did not diagnose schizophrenia. Dr. Rogers administered three symptom feigning tests, two that were focused on schizophrenia and one that was focused on brain injury or brain damage. The results of the first test were indeterminate but "in the upper half of the feigning" as to schizophrenia, and the second test found that Reed "endorsed two extremely rare symptoms" one would expect to find in a person with schizophrenia "only one in 400 times." Reed's score on the third test "indicated that he was not simulating memory loss or brain damage." Considering these test results, Reed's clinical history, and his own assessment of Reed from his interviews, Dr. Rogers concluded that Reed "was, probably, feigning symptoms, such as hallucination."

Dr. Rogers explained that one should not diagnose schizophrenia in an individual with "ongoing substantial substance use or other disorders or diseases that can mimic schizophrenia," which were present in Reed's case. He reviewed records describing Reed's conduct two days after the shooting and concluded they "were not consistent with . . . an acute psychotic episode." Dr. Rogers explained that schizophrenia "doesn't turn on and off, like a light switch," and even if a patient is treated with antipsychotic medications, he would expect to wait two to four weeks "to see a good response to begin to remove the hallucinations." While drug tests performed on Reed after the shooting were negative, Dr. Rogers determined that "only about 50 percent of the drugs" that he would look for "were being tested for by that drug

15

company."  Dr. Rogers had seen "a lot" of drug tests come back negative even when a person was "objectively impaired" and said they took substances.

Dr. Rogers reviewed the video of Reed at Helen Vine and saw nothing consistent with schizophrenia, though he would not rule it out from the video alone.  Reed's behavior at Helen Vine was "unremarkable" and did not reflect any "gross distortion that would be consistent with schizophrenia."

Dr. Rogers concluded from the video of Reed touching his penis after officers left the interview room that Reed was "unable to sustain an erection, despite experiencing libido, and disinhibition," and there was "some medical" or "physical reason" for this, such as "intoxication with certain substances." Dr. Rogers did not think "disinhibited masturbation [wa]s necessarily associated with schizophrenia," though he had seen people with schizophrenia engage in more "public masturbation," with no concern for whether "someone is in the room or not."

On cross-examination, Dr. Rogers acknowledged that some of the unusual statements witnesses described Reed making before the shooting could be consistent with schizophrenia.  He acknowledged that Reed had been prescribed antipsychotic medication, but said those medications are "over-prescribed for nonpsychotic reasons" because they "increase the effect of antidepressants and antianxiety medications for people that have PTSD." Dr. Rogers further acknowledged that video of Reed's arrest showed "episodes where he appeared to be distracted or interactive with an unseen" person, and explained that this "can be a symptom of schizophrenia, but it can be a symptom of a lot of other things."  Dr. Rogers had also reviewed the college notebook Reed wrote in before the shooting.  He found it to contain "hypersexual child-like" narratives, but not "a systematized delusion of

16

conspiracy in the kind of detail [he] would expect with a severe schizophrenic."

Dr. Berger, the second court-appointed forensic psychiatrist, also testified for the prosecution. He evaluated Reed in 2019. Dr. Berger opined that at the time of the shooting, Reed experienced "Xanax . . . intoxication," "stimulant intoxication," and "induced psychotic disorder," and suffered from several substance abuse disorders.

Dr. Berger noted that "the symptoms of psychosis, whether it's a result of schizophrenia or induced psychotic disorder, are indistinguishable." He explained that Reed's "anxiety, agitation, paranoia, evidence of hallucinations, restlessness, [and] abnormal movements" were consistent with intoxication from stimulants like cocaine and methamphetamine, while use of Xanax, a depressant, was "more consistent with other symptoms" Reed exhibited, such as "memory impairment" and "uncoordination." In addition, "certain substances can . . . induce psychotic symptoms, methamphetamine being one of the more common ones." If these symptoms resulted only from intoxication, they "would be expected to disappear as intoxication resolves." But "[i]n stimulant induced psychosis, a person usually develops more severe psychosis complications, like severe delusions," which "will often . . . persist for days, sometimes, weeks, even after the substance use stops." In that case, the person could have those symptoms even with no methamphetamine in their system, and that is true of cocaine and Xanax as well.

Dr. Berger did not diagnose Reed with schizophrenia. He explained that a person with schizophrenia "experiences psychotic symptoms for a minimum duration of time." In diagnosing schizophrenia, it was "important to determine whether the psychotic symptoms are better . . . explained by substance use."

17

Dr. Berger opined that, in the video of his arrest and his interview by police, Reed "show[ed] signs . . . consistent with someone hearing voices." But when Reed was interviewed about two days after the shooting, "there were no observable signs" of behaviors "consistent with psychotic symptoms, so there was provocative improvement . . . over the course of the first . . . two days." This "would be expected with a substance-induced psychotic disorder" and was "not typical" for a " 'Primary chronic disorder,' like schizophrenia, . . . that's independent of substance use."

Reed's negative drug test did not change Dr. Berger's opinion, since psychotic symptoms often persist for days or weeks in a substance-induced psychotic disorder, and substances including methamphetamine may become undetectable in a blood test while still having residual intoxication effects. Dr. Berger noted that the "timing of the blood test," which was "about 18 hours after the time of the offense," allowed "the substance levels to likely drop below the detectable level while still exerting their effects hours before."

Dr. Berger administered three tests to determine whether Reed was malingering and "two, in particular, were consistent with malingering." The third, more extensive test was indeterminate. On cross-examination, Dr. Berger acknowledged that some of the symptoms Reed exhibited during his arrest and post-arrest interview were consistent with psychosis, which can be caused by schizophrenia, "amongst other diagnoses." The material in Reed's notebook was, in Dr. Berger's view, consistent with auditory hallucinations or delusions of reference, which can be present in schizophrenia. But in Reed's case, Dr. Berger concluded these symptoms were "the result of substance-induced psychotic disorder, not schizophrenia." Dr. Berger further opined that overt inappropriate sexual behavior was "less characteristic of

18

schizophrenia" and might be "more indicative of certain substance intoxications."

4.     *Guilt Phase Verdicts*

At the end of the guilt phase, the jury was instructed by the trial court, heard closing argument, and retired to deliberate late on a Friday afternoon. The following Monday, the jury returned guilty verdicts on all counts and true findings on all special allegations.

5.     *Sanity Phase*

Several days later, the jury returned to hear evidence and argument in the sanity phase of the trial.

Reed presented testimony by Dr. John Chamberlain, a psychiatrist retained by the District Attorney's office to evaluate Reed in 2020. Dr. Chamberlain diagnosed Reed with "an unspecified schizophrenia spectrum and other psychotic disorder," which is less specific than a diagnosis of schizophrenia. The symptoms were "hallucinations," "hearing voices . . ., having delusions, false beliefs . . ., a disorganized thought process . . . , as well as poor impulse control." Dr. Chamberlain opined that Reed had these symptoms of this disorder at the time of the shooting.

Dr. Chamberlin explained that a person could have a substance-induced psychotic disorder and another psychotic disorder if "the psychosis persists regardless of whether their substance use is happening," specifically, "if there is evidence that the psychosis was happening when they were essentially clean and sober for at least a month." At the time he diagnosed Reed, he had been prescribed an antipsychotic for over a year. Dr. Chamberlin administered a test for malingering and Reed scored in the range classified as genuine responding. He found "some inconsistencies over time in terms of reports of how long he had had symptoms and when they

19

appeared," but "did not find evidence that [Reed] was making up, just out of nothing, this psychotic disorder." Dr. Chamberlain also reviewed the notebook Reed wrote in before the shooting and concluded Reed believed that by writing in the notebook, "he was communicating with people who were not actually sitting next to him or reading it," not merely "passing notes in class." Reed's "very odd statements," including "that he was a sex slave owned by Russians" and "would be a hit man if the person [he was conversing with] wished him to do so," evidenced "delusions."

Still, on cross-examination, Dr. Chamberlin opined that despite his disorder, Reed was "capable of knowing and understanding the nature and quality of his acts" and "capable of distinguishing right from wrong" at the time of the shooting. This opinion was based on Reed's actions surrounding the shooting, which "showed an ability to understand what was happening." Among other things, Dr. Chamberlin discussed how Reed demonstrated goal-oriented thinking by running back into Helen Vine after the shooting, "obtain[ing] keys to an automobile, . . . and then go[ing] through the cars in the parking lot until he found the one that corresponded to those keys and dr[o]ve away." In addition, Reed quickly gave law enforcement officers correct information when confronted with new information, "which is simply not how delusions work," because delusions are "fixed false beliefs." To change one's story in this way "indicate[s] a pretty thorough . . . capacity to understand the nature and quality of what you did." Dr. Chamberlin distinguished "the lack of sophistication" in Reed's denials from "disorganized thinking or a symptom of psychosis."

Psychiatrist Dr. Douglas Tucker also testified for the defense during the sanity phase. He had been retained by Reed's prior attorney to assess Reed in 2019. Dr. Tucker opined that Reed suffered from "auditory visual

20

hallucinations" and "delusions," and diagnosed Reed with schizophrenia and several substance abuse disorders. He concluded that Reed was "acutely psychotic" and legally insane at the time of the shooting.

Dr. Tucker's conclusion was in part based on the video of officers' interviews with Reed, which showed Reed appearing to "respon[d] to internal stimuli" by "looking around" and "kind of talking to someone who's not there," perhaps experiencing "an auditory . . . or visual hallucination." On the video of his arrest, "Reed appeared perplexed," "was subvocalizing" and "mumbling different things to himself or to somebody else," "was nodding and smiling inappropriately," and was "making statements and laughing as though somebody were there laughing . . . or talking with him." On the video of Reed's interview after his arrest, Reed's responses indicated "a disorganized thought process." Reed masturbated and was sexually aroused before and after the interview, which appeared to be related to "disorganized behavior." While "masturbating and . . . sexual behavior" do not "have to be related to schizophrenia," Dr. Tucker's "clinical judgment was that this [behavior] was related to schizophrenia at that time."

Dr. Tucker did not observe any overt symptoms of schizophrenia when he interviewed Reed in 2019. But he considered what Reed told him as well as witnesses' consistent reports of Reed's "paranoid ideation or thoughts, which had worsened in the year prior to [the shooting], but had been present for at least several years, by their reports." Reed's writing in his college notebook also supported this conclusion, reflecting that Reed believed he was "communicating telepathically with women in the class and the teacher" and was "unsure about whether a certain thing they[] [were] doing mean[t] they underst[oo]d what he just wrote or just said or thought." This is a "classic psychotic symptom" that is "very stressing."

21

Dr. Tucker explained that Reed had been prescribed antipsychotic medication at the time of their interviews. While this medication can be used to treat other conditions, at the dosage prescribed to Reed, "it's going to be for psychotic symptoms, usually delusions and hallucinations." Dr. Tucker also considered that schizophrenia has a hereditary component and Reed's mother was diagnosed with "schizophrenia or another type of chronic psychotic disorder." She manifested symptoms "very similar" to Reed's: "paranoid delusions and auditory hallucinations." Dr. Tucker specialized in studying individuals with a dual diagnosis of schizophrenia and substance abuse. He explained that "patients with schizophrenia may use certain drugs to help them cope with voices, or anxiety, or distress related to delusional paranoid thinking." Still, the symptoms that Reed exhibited on the night of the shooting were more consistent with "[m]ental illness" than drug intoxication, mainly due to Reed's negative drug test results from blood draws taken 18 and a half hours later.

On cross-examination, Dr. Tucker acknowledged that he did not administer any test to determine if Reed was malingering. He later explained that this was because, while he was "interested in what [Reed] sa[id]," he did not "bas[e] [his] opinions on that." Dr. Tucker acknowledged that some of Reed's behavior following the shooting could indicate that he did know the nature and quality of his act, but another possible explanation was that Reed was "in the middle of an acute paranoid episode and believe[d] that people want[ed] to kill him and that he need[ed] to flee."

After Reed rested his case, the People called Drs. Berger and Rogers to testify again as to their diagnoses and opinions about Reed's behavior and mental health. Each concluded that Reed was not incapable of understanding the nature and quality of his acts during the shooting or that

his acts were morally or legally wrong, and explained why Reed's behavior at Helen Vine and in the hours that followed supported these conclusions.

When the sanity phase was completed, the jury deliberated for a few hours and found Reed sane as to all counts. The trial court sentenced Reed to an indeterminate term of 90 years to life in state prison plus a determinate term of 10 years, eight months.

## II. DISCUSSION

### A. *Impeachment Evidence*

Reed claims the trial court erred by admitting evidence of his prior felony convictions to impeach his out-of-court statements to police concerning his state of mind. Reed maintains that these statements—for example, that he had been at the beach on the day of the shooting, that he misremembered his own age and name, and that he did not believe the officer who arrested him was a police officer—could not be impeached in this manner because they were nonhearsay statements he did not offer for their truth.[1]

#### 1. *Procedural Background*

Before the guilt phase, the People moved in limine to exclude Reed's out-of-court statements as hearsay. Reed moved to admit his "statements to police during and after his arrest, as relevant and trustworthy evidence of his state of mind under Evidence Code sections 1250 and 1252."[2] These provisions govern the admissibility of hearsay "evidence of a statement of the

---

[1] In his appellate briefing, Reed also presents argument about his unusual statements to friends and family before the shooting. But the trial court's ruling concerning impeachment did not address this testimony and instead focused on Reed's statements to police *after* the shooting. We affirm the court's ruling without the need to consider whether the prior convictions were admissible to impeach Reed's statements before the shooting, and will address those statements no further.

[2] Undesignated statutory references are to the Evidence Code.

23

declarant's then existing state of mind" (§ 1250, subd. (a)), subject to an assessment of whether "the statement was made under circumstances such as to indicate its lack of trustworthiness" (§ 1252). Alternatively, Reed argued to the trial court, and continues to argue on appeal, that his statements to police were not hearsay because he did not seek to admit them for their truth, "but rather as circumstantial evidence of his state of mind (namely, that he was delusional and psychotic)."

The trial court ruled that Reed's "direct statements" to police about his state of mind were hearsay and were not sufficiently trustworthy to be admitted under sections 1250 and 1252. But the court agreed with Reed that a subset of the statements were "offered as nonhearsay circumstantial evidence of [his] state of mind," citing *People v. Ortiz* (1995) 38 Cal.App.4th 377 (*Ortiz*). On appeal, Reed does not challenge the court's ruling that his direct statements about his state of mind were untrustworthy, nor does he challenge its determinations that particular statements fell into this category.

Recognizing that these "nonhearsay" statements would still be offered to show *Reed* believed them to be true, the trial court admitted them with a caveat: the People would be able to impeach Reed's credibility with certain prior convictions. The court reasoned that although the statements were "not offered for their truth," they were offered to show that Reed's "mental health was so impaired that he honestly, but mistakenly believed his self-serving statements denying any involvement in the alleged offenses." Reed thus "put his own truthfulness at issue" and, "[b]alancing the interests of both parties," the People were consequently "entitled to impeach [his] credibility (to show he was not reporting the events honestly)." During oral argument, the court characterized its ruling as "a hybrid" between allowing the evidence to come

24

in "for the truth and for state of mind." Considering that context and applying section 352, the court would allow the People to impeach Reed's credibility as if he had testified at trial.

> 2. *Analysis*

Our Supreme Court addressed issues very similar to those raised by the trial court's ruling in *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). As *Clark* held, a ruling that admission of an out-of-court statement offered by the defense is subject to impeachment is reviewed for abuse of discretion. (*Id.* at p. 590; *Ortiz, supra,* 38 Cal.App.4th at p. 386 [trial court has broad discretion to determine the admissibility of evidence, particularly where this involves "questions of relevancy, the state of mind exception to the hearsay rule and undue prejudice"].)

Contrary to Reed's argument, we are inclined to read *Clark* to support the trial court's ruling in our case. The defendant in *Clark* was prosecuted as an accomplice to murder and sought to introduce the direct perpetrator's statement during his arrest: " ' "Oh, my gosh, not a 187, please, lady, don't die." ' " (*Clark, supra,* 63 Cal.4th at p. 589.) The defendant moved to admit the statement as nonhearsay evidence of the perpetrator's state of mind, and argued that because the statement was not offered as hearsay, "the prosecutor would not be able to impeach it." (*Id.* at p. 590.) The trial court ruled that the statement would be received for both hearsay and nonhearsay purposes and thus could likely be impeached. (*Ibid.*) As a result, the defendant elected not to present testimony about the statement. (*Ibid.*)

*Clark* affirmed the trial court's ruling. It explained that "the case law, including [*Ortiz*], describes two different theories under which statements of a declarant's present state of mind can be admitted: (1) as hearsay under the . . . section 1250 exception . . ., and (2) as nonhearsay circumstantial evidence

of a declarant's state of mind." (*Clark*, *supra,* 63 Cal.4th at pp. 590–591.) *Clark* held that, *regardless of whether the perpetrator's statement was admissible as hearsay*, the trial court did not abuse its discretion in denying the defendant's request for a ruling precluding the prosecution from impeaching the statement. (*Id.* at p. 591.) Even if the statement was only offered as circumstantial evidence of the perpetrator's state of mind, "[d]efense counsel never articulated a theory of admissibility . . . such that all questions of [the statement's] truth or falsity would be irrelevant—such as, for example, if the statement were being offered solely for its influence on a listener." (*Ibid.*) Rather, the theory was that the perpetrator "was shocked and afraid after he shot the victim," implying he had not intended to shoot her. (*Ibid.*) The prosecutor had contrary evidence, and *Clark* held that "[a]dmitting the statement as evidence of [the perpetrator]'s state of mind would have opened the issue to being contested by the prosecution." (*Ibid.*)

The same appears to be true here. Whether best characterized as hearsay statements of his state of mind or circumstantial evidence of the same, Reed's statements to police about his purported beliefs in the hours after the shooting—for example, his claim that he believed he had been at the beach that day—put his veracity squarely at issue. (See *People v. Edwards* (1991) 54 Cal.3d 787, 818–821 [affirming trial court's exclusion of self-reported psychiatric symptoms defendant wrote in a notebook after the charged crimes, observing that "[t]he need for cross-examination is especially strong" where the defendant knew he had killed and wounded the victims and "had a compelling motive to deceive and seek to exonerate himself from" those acts]; *People v. Gurule* (2002) 28 Cal.4th 557, 605–606 [affirming trial court's admission of recorded police interview from which defendant's self-

26

serving hearsay statements were redacted].) The trial court appeared to recognize this by characterizing its ruling as "a hybrid."

Ultimately, we need not decide whether the trial court erred in its approach to this evidence because even if it should have allowed Reed to introduce these statements without impeachment, any error in allowing the jury to consider his prior convictions was not prejudicial and did not render his trial fundamentally unfair.[3] (See *People v. Hin* (2025) 17 Cal.5th 401, 482 [analyzing these issues together].) Applying *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), we ask whether it is reasonably probable that Reed would have achieved a more favorable result absent the asserted error. (See *People v. Robinson* (2024) 99 Cal.App.5th 1345, 1359 [applying *Watson* to admission of prior sexual offense]; *People v. Collins* (1986) 42 Cal.3d 378, 391 & fn. 12 [*Watson* applies to impeachment of defendant with prior convictions].)

Here, the court carefully considered which prior convictions to admit, excluding some as unduly prejudicial, and Reed does not challenge that ruling on appeal. The convictions that the court admitted—for possession of cocaine base for sale, possession of a firearm as a felon, possession of a stolen vehicle, and selling marijuana—were for crimes very different from and far less shocking than those Reed stood accused of at trial. And the jury already

---

[3] For the same reason, we need not address Reed's claim that the Evidence Code does not authorize the introduction of prior convictions, specifically, to impeach a declarant whose statements are offered for a nonhearsay purpose (*People v. Curl* (2009) 46 Cal.4th 339, 362 [finding no prejudice in the admission of such evidence]).

27

knew that Reed had been incarcerated and sold drugs before the shooting from other evidence.

Most importantly, Reed's own statements to police and in jailhouse calls impeached his self-serving professions of his state of mind far more powerfully than the prior convictions. (See *People v. Jones* (2012) 54 Cal.4th 1, 63, 67 [exclusion of expert testimony on how defendant's alleged mental disorder may have affected his thinking processes was not prejudicial given defendant's own statements reflecting he intended to commit the charged offenses].) So too did his repeated, if ineffectual, attempts to evade arrest and his otherwise inexplicable decision to throw his gun out of a car as he was pursued at high speeds by someone he claimed not to believe was a police officer. Consistent with a commonsense interpretation of Reed's behavior, while the experts disagreed on a specific diagnosis and its impact on Reed's mental state, a clear majority opined that he understood the nature of his actions. Under the circumstances, we find no reasonable probability that the prior convictions impacted the jury's verdicts.

## B.    *Expert Testimony Concerning Schizophrenia and Psychosis*

Reed next claims the trial court erred by excluding certain testimony by Dr. Ghannam connecting his asserted schizophrenia and psychosis to his mental state at the time of the shooting.

### 1.    *Procedural Background*

The People filed a motion in limine to exclude both expert and lay testimony concerning Reed's mental illness from the guilt phase of his trial. During oral argument on that motion, Reed urged and the trial court "agree[d]" that it was unnecessary for Reed's experts to preview their testimony at a hearing under section 402, because the experts had provided reports outlining their conclusions. The court ruled that the proffered

testimony was relevant to allow the jury to "infer that the manifestations" of Reed's conditions "resulted in his not forming the specific intent" to commit charged crimes.  The court decided to address more specific issues regarding the scope of the experts' testimony "by way of objections, rather than exclusion of the evidence" through a pretrial ruling.[4]

 2. *Legal Background*

Section 28 of the Penal Code provides that evidence of a defendant's mental disorder "shall not be admitted to show or negate the *capacity* to form any mental state," but only to show "whether or not the accused *actually formed* a required specific intent."  (Penal Code § 28, subd. (a), italics added.) Penal Code section 29 prohibits guilt-phase expert testimony "as to whether the defendant had or did not have the required mental states," including "intent," and directs that this question "shall be decided by the trier of fact." Subdivision (d) of section 28, meanwhile, affirms the court's "discretion, pursuant to the Evidence Code, to exclude psychiatric or psychological evidence on whether the accused had a mental disease, mental defect, or mental disorder at the time of the alleged offense."  "A trial court's decision to

---

[4] The People contend that Reed failed to preserve any challenge to the trial court's later, more specific rulings on the scope of Dr. Ghannam's testimony by opposing a section 402 hearing and failing to provide a further "basis for admission upon objection to the testimony at trial," which they claim the court's motion in limine ruling required.  This argument is unsupported.  The trial court did not suggest Reed needed to make any additional showing to support the admission of his experts' testimony.  And the People cite no authority suggesting the party *offering* evidence must obtain a definite ruling on a motion in limine or renew his arguments at trial: as the People's authorities hold, these principles apply instead to the party objecting to the introduction of evidence.  (*People v. Brown* (2003) 31 Cal.4th 518, 547; *People v. Jennings* (1988) 46 Cal.3d 963, 975, fn. 3.)

admit or exclude expert testimony" applying these provisions "is reviewed for abuse of discretion." (*People v. Pearson* (2013) 56 Cal.4th 393, 443 (*Pearson*).)

Penal Code sections 28 and 29 establish "twin prohibitions: no testimony on the defendant's capacity to have, or actually having, the intent required to commit the charged crime." (*People v. Cortes* (2011) 192 Cal.App.4th 873, 910 (*Cortes*).) But they "do not prevent the defendant from presenting expert testimony about any psychiatric or psychological diagnosis or mental condition he may have, or how that diagnosis or condition affected him at the time of the offense, as long as the expert does not cross the line and state an opinion that the defendant did or did not have the . . . mental state required for conviction of the specific intent crime with which he is charged." (*Id.* at p. 908.) The trial court enjoys some discretion in drawing this line. For example, in *Pearson, supra,* 56 Cal.4th at pp. 450–451, our Supreme Court affirmed the trial court's rulings prohibiting the following: asking an expert "what was 'disorganized' about" a discussion the defendant initiated before the charged crimes; questioning the expert about what the defendant was thinking based on his comments; expert testimony that the defendant " 'seemed to be [in] a reactive kind of state, rather than . . . cold and calculated' " and " 'didn't seem to know what he was doing' " at the time of the crimes; and expert testimony that the defendant's " 'impairment' " was " 'part of why he couldn't handle the stress he was under.' "

3. *Analysis*

As expected, the trial court ruled on various objections to Dr. Ghannam's testimony during trial. Reed contends several rulings were in error.

First, Reed claims the trial court inappropriately cut off Dr. Ghannam's testimony that it appeared from the video of his intake at Helen Vine that Reed was hearing voices. The court stated that Dr. Ghannam could not testify as to Reed's "mental state" or "what [Dr. Ghannam thought Reed] was thinking," and instructed the jury to disregard that opinion. But moments later, Dr. Ghannam testified without objection that Reed's "disorganized" behaviors were consistent with "what [he has] seen with a number of individuals" he had "evaluated to have schizophrenia or psychotic spectrum disorder." The doctor further described what he observed in the Helen Vine video as Reed making "head movements back and forth, as if he's hearing voices or worried someone is behind him or something is behind him," which is "a symptom of paranoia." Dr. Ghannam continued: "So he seemed not only very agitated, but, also, very paranoid and worried, and that is a hallmark of hearing voices in your head." Reed does not acknowledge this testimony or claim there was more on this point he wished to elicit. Any error in the court's initial ruling was therefore harmless. (*People v. Rangel* (1992) 11 Cal.App.4th 291, 300 [any error in excluding expert testimony on defendant's mental state was harmless where such testimony was elicited on cross-examination]; *People v. Buenrostro* (2018) 6 Cal.5th 367, 399–400 [any error in excluding expert testimony was harmless where it was "cumulative of other testimony concerning defendant's delusions"] (*Buenrostro*).)[5]

---

[5] We analyze this issue under *Watson*. (*Cortes*, *supra,* 192 Cal.App.4th at p. 912; *People v. Herrera* (2016) 247 Cal.App.4th 467,478 (*Herrera*).) "Although completely excluding evidence of an accused's defense theoretically could rise to th[e] level" of a constitutional violation reviewed under *Chapman v. California* (1967) 386 U.S. 18, 24, "excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103 (*Fudge*)

Next, Reed claims the trial court erred by sustaining an objection to Dr. Ghannam's testimony that when Reed approached and stared into the camera after masturbating during a break in his interview by police, it "len[t] credence to the notion that he may have been out of touch with reality." But Dr. Ghannam had just testified, in response to questions by the defense, that "self-serving masturbatory behaviors" are "a very common symptom of someone who has schizophrenia and is acutely psychotic," which the expert earlier described as having an episode where one's "perception of reality is disconnected." Moreover, the testimony the court excluded had been offered in response to a question about whether Reed knew he was being taped, which Dr. Ghannam did not indicate had any bearing on his opinion about this behavior. Any error was harmless.

Reed claims the trial court erred by sustaining objections to two questions about how schizophrenia and psychosis "affect [a person's] ability to form the intent to kill another person," or cause "a problem forming intent." These rulings were correct. The questions violated the first of the "twin prohibitions" on testimony about a defendant's mental state, "testimony on the defendant's capacity to have . . . the intent required to commit the charged crime." (*Cortes, supra,* 192 Cal.App.4th at p. 910.) Reed's argument that only an unequivocal statement that "a person lacked the capacity to form intent" should be excluded is unsupported by any citation to authority and misreads those he relies on elsewhere, like *Cortes*.

Finally, the trial court sustained the prosecutor's objection to a question about whether Dr. Ghannam concluded Reed was in a psychotic state at Helen Vine based on the video he had reviewed. We are inclined to

[*Watson* standard generally applies to trial court's application of ordinary rules of evidence].)

32

agree with Reed that this was in error. But on redirect examination, Dr. Ghannam clearly stated his opinion that "Reed was suffering from schizophrenia and severe psychiatric distress and psychotic spectrum disorders at the time of the incident." He also testified on cross-examination that Reed "was having a psychotic episode" at the time he was interviewed by police. And he testified that many of Reed's behaviors before, during, and after the shooting were consistent with psychosis and/or schizophrenia. Again, Dr. Ghannam's testimony covered the issue Reed raises, so any error in the court's ruling was harmless.

*Cortes* and *Herrera* do not change our analysis. In those cases, the trial courts broadly prohibited expert testimony concerning the defendants' mental conditions at the time of the charged crimes. In *Cortes*, the court "preclude[d] *all* testimony about the [defendant]'s own diagnosis, or mental condition, at the time of the offense," and "limit[ed] the expert's testimony to diagnoses or mental conditions 'in the population at large,' and their 'effects on a general person's behavior who might have that symptom.' " (*Cortes*, *supra*, 192 Cal.App.4th at p. 909.) The court in *Herrera* similarly excluded expert testimony concerning " 'anything related to' " the defendant's mental state at the time of the crime. (*Herrera*, *supra*, 247 Cal.App.4th at pp. 474–475.) That was not the case here: Dr. Ghannam testified directly and at some length about Reed's mental conditions during the shooting.

## C.    *Expert Testimony Concerning Traumatic Brain Injuries*

Reed's final claim of error is that the trial court misapplied the limitations on an expert witness's use of case-specific hearsay established by *People v. Sanchez* (2016) 63 Cal.4th 665, 686 (*Sanchez*) to exclude Dr.

33

Ghannam's opinion that he had sustained traumatic brain injuries.[6] The court relied on both *Sanchez* and *People v. McVey* (2018) 24 Cal.App.5th 405, 417 (*McVey*), which it discussed with the parties before excluding Dr. Ghannam's opinion on the ground that it was based solely on Reed's hearsay self-reports. During that discussion, Reed's counsel acknowledged that pertinent records documenting Reed's medical history had been destroyed.

On appeal, Reed does not claim there was any nonhearsay evidence to support Dr. Ghannam's opinion that he suffered traumatic brain injuries, and concedes that "the basis for [that] diagnosis was an interview of Reed."[7] He acknowledges that such an opinion is inadmissible under *McVey*, but asks us to hold *McVey* was wrongly decided. On this record, we decline to do so.

We first observe that our Supreme Court's opinion in *People v. Nadey* (2024) 16 Cal.5th 102, 163–164 is not contrary to *McVey*. *Nadey* affirmed that insofar as an expert "was simply relaying the contents of [a] report [not in evidence] to the jury, his testimony constituted hearsay" and was "potentially problematic." *Nadey* did not address *McVey*, nor analyze

---

[6] The People incorporate by reference the forfeiture argument we have addressed in footnote 4 above as to this claim of error. For the reasons already discussed, this argument fails.

[7] Reed notes that the People's expert Dr. Rogers administered a test to determine whether he was simulating brain damage or memory loss, which did not indicate that he was. But he does not argue that this test sufficed on its own to support a diagnosis of traumatic brain injuries. And while Reed quotes a general statement from Dr. Ghannam's report that his four diagnoses, collectively, were based on information including the evaluation of certain records, the report gave no indication that the diagnosis of traumatic brain injuries, specifically, was based on anything other than Reed's self-reports.

*Sanchez* in detail because it held any error in admitting the expert testimony it discussed was harmless.

Similarly, here, any error in excluding testimony concerning Reed's asserted traumatic brain injuries was harmless under *Watson*. (See *Buenrostro, supra,* 6 Cal.5th at p. 400; *Fudge, supra,* 7 Cal.4th at p. 1103.) The record is devoid of evidence linking brain injuries to Reed's mental state during the shooting. The expert report that Dr. Ghannam prepared before trial does not explain the link. Nor does Reed's appellate briefing, which focuses on the lack of evidence that Reed was feigning symptoms of brain injuries without addressing how that diagnosis would support an inference that he did not harbor the intent required to convict. Reed's bare assertions that it would do not meet his burden to show a reasonable probability that excluding this testimony affected the jury's verdicts. (See *People v. Gonzalez* (2018) 5 Cal.5th 186, 195 [the defendant bears the burden under *Watson* to establish a reasonable probability that error affected the trial's result].) The only symptom of traumatic brain injury that Reed mentions is memory loss. But he does not explain the connection between memory loss and his intent during the shooting—nor does one appear to us. For this reason, and given the strength of the evidence that Reed did act with the required intent, we find no reasonable probability that the jury would have returned different verdicts had it heard testimony about traumatic brain injuries.

## III.  DISPOSITION

The judgment is affirmed.

                                    _____

                                    Smiley, J.

WE CONCUR:

_____

Banke, Acting P.J.

_____

Langhorne Wilson, J.

*People v. Reed*  A166080

36